■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v CARLOS CASTRO, Respondent. — Orders, Supreme Court, New York County, entered March 7, 1980 and April 8, 1980 which granted, respectively, defendant's motion to suppress a gun and two ounces of cocaine seized from him, reversed, on the facts, and suppression denied. Undercover police officers of the Drug Enforcement Task Force arranged to purchase three pounds of cocaine from Zurita and Perez for $75,000. They had made three other purchases from them and the sellers were to be arrested on the completion of this transaction. The purchase was to take place at a beer distributorship in The Bronx, a site unfamiliar to these police. A backup team staked out the building at 4:40 P.M., hours in advance. At 7:15, the defendant, who was unknown to the police, came out of one of three adjacent front doors of the building with Zurita. They talked and Zurita re-entered the building, leaving the defendant standing outside. A few minutes later, Zurita reappeared, talked again to the defendant and re-entered, again leaving the defendant outside by a door. From then until 8:40 when the undercover officers arrived with $75,000 in cash to complete the sale, 25 to 30 people went in and then came out of the building. In every instance the defendant accompanied them into the building and back out again. Three undercover police arrived by car. Two got out, leaving the driver, and spoke to the defendant who was by one of the doors. They returned to the car and, five minutes later, Zurita came

out, talked to the defendant and then went to the undercovers' car. Two of them followed him into the building. Five minutes later, one of the undercover officers came out of the building, went to the car, got the driver and the two of them entered the building. This was the signal, prearranged with the backup team, that the purchase had taken place. Two of the backup team went into the left doorway of the building with guns drawn. Just inside the door they saw the defendant and two unknown men. They identified themselves as police officers and told the men to put their hands against the wall. When the defendant raised his arms, his jacket rose over his belt, and the police saw and seized a fully loaded revolver from the waistband of his trousers. A subsequent search disclosed the two ounces of cocaine hidden under his sweater. The motion Judge held that the defendant should have been seen by the police as a mere bystander at a place open to the public for business or, at worst, as one seen in the company of criminals but otherwise acting innocently. We cannot agree. When the police first saw the defendant he had come out of the beer distributorship with Zurita where the two had been for at least two and a half hours. He was left standing by Zurita outside, by the door, on this February night. Over the next hour and a half, the defendant escorted 25 to 30 people into the building and back out. The undercover officers did not enter the building directly. They talked to the defendant and then waited in the car. When Zurita appeared, he went first to the defendant before going to the undercovers' car. From these actions the watching backup team had probable cause and every reason to believe that the defendant was implicated in this narcotics sale as a lookout to direct the undercover officers to Zurita and as a guard for this $75,000 cash transaction. The police could reasonably expect an arsenal of weapons to surround a $75,000, three-pound cocaine purchase. One member of the backup team testified that it was his experience with the Drug Enforcement Task Force that guns were involved in 60% to 70% of the cases where a drug sale exceeded eight ounces. A similar observation has been made by the Court of Appeals. "Defendants would minimize drug trafficking by arguing that it is not a crime of violence. Because of their illegal occupation, however, drug traffickers do often commit crimes of violence against law enforcement officers and, because of the high stakes, engage in crimes of violence among themselves" *(People v Broadie,* 37 NY2d 100, 112). The arrest of these drug sellers was an undertaking fraught with danger for the police. Having observed the defendant's part in the transaction, it would have been suicidal for the police to have left him unsearched. We must, therefore, disagree with the motion Judge's finding that "The defendant's behavior was not * * * dangerous to the safety of the police * * * Nor was the alleged crime, a narcotics sale, a violent felony in which weapons would likely be involved". Concur — Kupferman, J.P., Sullivan, Silverman and Lynch, JJ.

Carro, J., dissents in a memorandum as follows: Were the record to support the conclusions drawn by the majority that the backup team had "probable cause" or "every reason" to believe that the defendant Castro was implicated in this drug transaction as a lookout and a guard [and that "in every instance" "the defendant escorted twenty-five to thirty people into the building and back out"], I would join in holding his seizure to have been reasonable. However, such is not the case. There was sparse testimony concerning the activities of defendant. It was never made clear how many persons he accompanied into the premises or how many persons he engaged in conversation — though it was established that he spoke to two of the undercover officers, who, regrettably, never appeared to clarify defendant's

role. The specific, articulable facts forming the justification for his seizure refer not to defendant but to another, the drug seller. The suspicion surrounding Castro arises from his being seen in the company of the seller in front of the premises in which the sale was scheduled to take place, his remaining in and about the premises for approximately one and three quarter hours, engaging various persons, including two undercover officers, in conversation, and accompanying various persons inside. No conversations were overheard, no weapon or "bulge" was seen, nor did the officers have any prior information concerning him. The premises involved is a typical multiple dwelling containing a store on street level with a separate door leading to the upstairs apartments, on a block consisting of such buildings. In this instance, the store housed a beer and soda distributorship, which was apparently open for business. This building had three adjacent doors: a large double door on the left (Door No. 1), behind which were stacked cases of beer and soda; Door No. 2, which leads to the office of the beer distributor; and Door No. 3, on the right, leading upstairs. During the time in question, both doors to the beer distributor were standing open, while Door No. 3, leading to the upstairs apartments, was closed. The seller and the undercover officers had entered Door No. 3. When the signal was given that the sale had been consummated, most of the 11 or 12 waiting officers rushed Door No. 3. Two of the officers rushed with guns drawn to Door No. 1, where the defendant was standing with two other men and ordered them to raise their hands over their heads and place them up against the wall, at which time Castro's weapon became visible. The two men with Castro were unknown to the police; they may well have been customers of the beer distributor. No observations had been made of them and no contraband was found on them. There was no "probable cause" or "reasonable ground" to seize or search them. They were released, as Castro would have been had no contraband been found on his person. Regardless of the arguments now urged by the People, and adopted by the majority, that defendant was involved in the drug sale as a lookout and a guard, he has never been charged with "acting in concert" in the sale or with a conspiracy to sell. The subjective hunch of these officers was never supported by the testimony. The apparently simple solution would have been for the People to have produced the two undercover officers who spoke to the defendant and who should have been in a position to shed light on a possible connection between defendant and the drug sale. This was a "buy and bust" operation, where the sellers were immediately arrested, so that it would ordinarily be no longer necessary to protect their identity. Having failed to produce either them or an explanation for their nonappearance, and having failed to charge the defendant in connection with the sale, the People invite the inference that the connection may not exist. The defendant was not in the immediate area in which the drug sale and arrests were taking place. The police objective of securing the building could have been accomplished by continuing to observe defendant until the arrests were completed. Given the above analysis, I believe the Hearing Judge was correct in granting the motion to suppress evidence.