THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
CARLOS CASTRO, Appellant.

First Department, May 15, 1984

APPEARANCES OF COUNSEL

*John Goodwin* of counsel (*Mary Cheasty Kornman* with
him on the brief; *Robert M. Morgenthau, District Attorney,*
attorney), for respondent.

*Judith Waksberg* of counsel (*William E. Hellerstein,* at-
torney), for appellant.

OPINION OF THE COURT

Ross, J. P.

The New York Drug Enforcement Task Force (Task
Force) is composed of law enforcement officers who are
assigned from the Federal Government, the New York
State Police and the New York City Police Department. Its
principal assignment is to conduct long-term narcotics
investigations of selected targets. For several months prior
to February 28, 1979, the Task Force had been investigat-
ing the activities of Ramon Zurita (Zurita) and Nick Perez
(Perez).

Based upon information received by the Task Force, Zurita was allegedly going to make a drug sale on the evening of February 28, 1979, from premises 53 Bruckner Boulevard in The Bronx. In anticipation of this act taking place, the Task Force set up an observation post in an unmarked police van parked directly across the street from those premises. This van was equipped with one-way mirrors and various communication devices. It was manned by New York State Police Investigators Donald L. Rohrmann (Rohrmann) and George Le Moine (Le Moine).

Fifty-three Bruckner Boulevard had three doors leading into it. On the extreme left, there was a large open bay door that led into the supply room of a beer distributorship. In the middle there was a roll top door, which was closed to within a foot of the bottom, and this door led into the distributorship's office. Finally, on the extreme right, there was a door that led into upstairs apartments.

At about 7:15 P.M., Rohrmann and Le Moine testified that they saw defendant and Zurita come out of the extreme right-hand door. Prior to that moment, defendant had been unknown to the Task Force. Zurita and defendant walked over to the open door to the supply room, where they conversed for a few minutes, until Zurita left defendant and went into the distributorship's office. Defendant continued to stand by the open door. Within 5 to 10 minutes, Zurita left the office and returned to the open door to talk further with defendant. After a few minutes, Zurita left defendant in front of the open door, and Zurita re-entered the door leading to the apartments. During the next hour or so, Rohrmann and Le Moine watched as the defendant spoke with approximately 25 to 30 persons, before each one of these persons entered one of the three doors, mentioned *supra,* that led into the subject premises. These persons would remain inside a little while and then leave the area.

Around 8:40 P.M., three undercover officers, who were assigned to the Task Force, appeared on the scene in an unmarked car, which they parked down the street from 53 Bruckner Boulevard. Two of these undercover officers exited this car and approached the defendant. They spoke to the defendant briefly and then went back to their car.

Some minutes later Zurita appeared back on the street and went over to defendant. A short conversation ensued between them. Now Zurita went over to the car where the three undercover officers were, and spoke to them. As a result of this conversation, two of the undercover officers exited the car and followed Zurita through the door leading into the apartments. At about 8:55 P.M., one of these two undercover officers reappeared on the street and he was joined there by the third undercover officer, who heretofore had remained in the unmarked car. These officers now walked toward the subject premises. When they reached them, a prearranged signal was given by a Task Force field supervisor. Thereafter, all of the backup teams, including Rohrmann and Le Moine, converged on 53 Bruckner Boulevard for the purpose of making arrests in connection with an alleged drug sale that had been made by Zurita.

Rohrmann and Le Moine got out of their van and ran over to the open door where the' defendant and two men were standing. They identified themselves as police officers. The defendant, and the two men with him, were told to turn around and put their hands up against the cartons along the supply room wall. According to Rohrmann's trial testimony: "when [defendant] raised his hands above his head, the top of his jacket * * * came up over his belt and I [Rohrmann] observed * * * the butt of a handgun. I yelled, 'Look out, he's got a gun,' and at this time * * * Le Moine turned around at the same time [defendant] was bringing his right arm down towards the handgun * * * Le Moine grabbed his arm and twisted it away from the weapon, and we wrestled him to the ground, took the gun, and placed handcuffs on him, told him he was under arrest".

The weapon recovered from the defendant was an operable Smith and Wesson .38 calibre revolver, which was loaded with five rounds of ammunition.

After defendant's arrest, Le Moine advised defendant of his *Miranda* rights and searched him. In the course of this search Le Moine found a plastic envelope, which contained a white powder. An analysis of this powder indicated that it was cocaine and weighed just under two ounces, to wit: 56.04 grams. Defendant told Le Moine that he neither worked nor lived at the subject location.

Subsequently, defendant was indicted for his possession of the revolver and the cocaine.

The defendant testified in his own behalf. In substance, his defense was that he just happened to be present during the raid. He said he regularly jogged from 149th Street and the Grand Concourse in The Bronx to 99th Street in Manhattan and he would pass 53 Bruckner Boulevard. The night of the raid was the first time he had ever stopped at that location and that he paused there at about 8:00 P.M. to buy a soda from the beer distributorship. He drank the soda in front of the open door, while standing on the sidewalk. At about 8:15 P.M., Zurita, whom he did not previously know, asked him whether the soda was cold and then they talked together for about 15 minutes, at which time Zurita left. As defendant continued to stand on the sidewalk with a couple of other men, Rohrmann and Le Moine ran up and pushed the three of them into the supply room. When Le Moine took the gun away from defendant, allegedly Le Moine and Rohrmann hit him. Defendant contended that Le Moine told him that the subject gun belonged to a police officer. In his testimony, defendant explained that he had obtained the gun about a month before, when he allegedly took it away from an alleged robber, who claimed to be a police officer. However, defendant admitted he neither reported this alleged robbery nor his possession of the gun to the police. Also, defendant denied that he possessed the cocaine that Le Moine had testified he found, when he searched defendant.

Without defense objection, the People called three rebuttal witnesses. In total, their testimony took up only 17 pages in a 461-page transcript. In rebuttal, (1) Le Moine and Rohrmann testified that they never struck defendant, other than during the struggle over the gun that the defendant admitted he possessed; (2) Le Moine denied telling the defendant that the defendant's gun formerly belonged to a police officer; and, (3) both Le Moine and Rohrmann denied, based upon their examination of the beer distributorship and its supply room, that there was any soda in that location on the night of the arrest.

The third rebuttal witness was Santiago Martinez (Martinez), who is a New York City police officer assigned to the

Task Force. Martinez testified that he was one of the three undercover officers in the unmarked car. Furthermore, he testified that he and another officer got out of the car at about 8:40 P.M. on February 28, 1979 and approached the defendant. According to Martinez, defendant was standing in front of the subject premises, and Martinez asked defendant, in Spanish, whether Zurita was there. Subsequent to defendant replying that Zurita was not there, Martinez gave defendant his name and told defendant to give Zurita a message that Martinez would be waiting for Zurita in the car.

We find that the guilty verdict is fully supported by the evidence.

Our dissenting brethren contend that, because defendant had not been indicted for selling drugs, the People's presentation of their case against him was prejudicial since it implied "that he was guilty of acting in concert or conspiring to sell drugs, and because the prosecutor improperly presented 'rebuttal' testimony on purely collateral matters". We disagree.

"[T]he trial court has the discretion to admit some evidence of other crimes when it is needed as background material * * * and the People's case might well have been prejudiced if their witnesses had given only generalized accounts without supplying any particulars" (*People v Montanez,* 41 NY2d 53, 58). The instant case was presided over by an experienced Trial Judge, who was in complete control of the proceeding and sensitive to the defendant's rights. During the course of the prosecutor's opening, defense counsel objected to any reference by her to the nature of the Task Force investigation. The trial court, in denying that objection, stated to counsel, outside the presence of the jury, in pertinent part: "Obviously no full narration will be permitted in regard to the ongoing investigation involving other people, but it seems to me unreasonable to believe that this case can have any meat on its bone [*sic*] without some reference to what the officers were doing there, what they saw when they were there and why they arrested this defendant." Based upon our review of the record, we hold that the trial court did not abuse its discretion in permitting the People to present the background evidence.

Incidentally, the dissents concede that "the bulk of the details regarding the larger 'buy and bust' was elicited through defense counsel's cross-examination." For example, it was defense counsel, who asked these questions of Investigator Rohrmann, on cross-examination, as to defendant's participation in Zurita's drug operation:

"Q. Well, what connection did he have with the sale?

"A. Mr. Castro [defendant] was in conversation with Mr. Ramon Cerita [sic] [Zurita] who was one of the main targets of the investigation.

"Q. And the conversation, that you didn't hear at all?

"A. That's correct, I didn't hear the conversation * * *

"Q. So what connected Castro with the sale?

"A. Mr. Castro appeared to be the lookout for the transaction that was going down at 53 Bruckner Boulevard * * *

"Q. And tell me exactly what factors enable you to arrive at that conclusion other than the conversation?

"A. Based on my experience as a police officer."

Our examination of the record does not support the dissents' opinion that the defense counsel was compelled by the People's presentation to go into this detail. In fact, by his extensive cross-examination of Investigators Rohrmann and Le Moine in this area, defense counsel opened the door to the introduction of evidence about three previous undercover purchases of cocaine and that a sale of four pounds of cocaine at a price of $75,000 was scheduled for the evening of February 28, 1979.

The dissents claim that the People's surveillance evidence did not "provide a logical nexus", which indicated that defendant "was a cohort of Zurita and Perez in their sale of $75,000 worth of cocaine to the undercover officers and thus had every reason to be in possession of a gun and cocaine". We disagree. The observations made of the defendant's activities, by Investigators Rohrmann and Le Moine, such as that when first seen, defendant was with Zurita, coming out of the door leading to the apartments, that thereafter, between 25 and 30 persons spoke with defendant before entering the subject premises, and defendant's conversation with Officer Martinez relative to Zurita, did establish such a "logical nexus". Therefore, the jury could

reasonably assume that defendant was inextricably linked to Zurita's business.

We agree with the dissents that the People may not present evidence on collateral matters for the sole purpose of impeaching the credibility of a witness. However, such evidence may be offered for the purpose of disproving alleged facts set forth by the witness on direct examination (see Richardson, Evidence [Prince, 10th ed], § 517; *People v Schwartzman,* 24 NY2d 241, 245-246). We find that the People's rebuttal was not "collateral" as claimed by the dissents since it was for the purpose of disproving the defendant's explanation of why he was at the premises. Thus, the People had a right to present the testimony of Investigators Rohrmann and Le Moine that they found no soda in the beer distributorship and its supply room; and, the testimony of Officer Martinez that he gave a message to defendant for Zurita. In passing, we note that, as mentioned *supra,* the defense raised no objection to the People's rebuttal and so no issue has been preserved for review.

We have examined the other points of alleged error raised by the defendant and find them equally lacking in merit.

Accordingly, the judgment, Supreme Court, New York County (Fritz W. Alexander, J.), rendered September 21, 1981, convicting defendant, upon a jury verdict, of the crimes of criminal possession of a controlled substance in the second degree (Penal Law, § 220.18) and two counts of criminal possession of a weapon in the third degree (Penal Law, § 265.02, subds [1], [4]) and sentencing him to concurrent indeterminate terms of imprisonment of three years to life on the drug conviction and of one year to three years on each weapons conviction, should be affirmed.

CARRO, J. (dissenting). Defendant was indicted for criminal possession of a controlled substance in the second degree and two counts of criminal possession of a weapon in the third degree. Because the People, however, chose to rely at trial upon evidence implying that he was guilty of acting in concert or conspiring to sell drugs, and because the prosecutor improperly presented "rebuttal" testimony on purely collateral matters, I dissent. The egregiousness of this prejudicial presentation denied to defendant any

semblance of a fair trial. I also find it offensively disingenuous of the District Attorney's office, on appeal, to argue that these errors were not fully objected to and not, therefore, presented for review.[*]

This is a case where a little fish got caught up in the net with the big fish. A Drug Enforcement Task Force had been staking out a Bronx beer and soda distribution warehouse from midafternoon until just about 9:00 P.M., when they closed in and arrested the subjects of the investigation, Messrs. Zurita and Perez. The undercover officers had never seen appellant before that night and he was not arrested as, nor charged with, being part of that drug operation. Defendant just happened to be in front of that building when the police moved in and the Court of Appeals has upheld the reasonableness of the stop and search of defendant, in consideration of the "circumstances surrounding the encounter." (*People v Castro,* 53 NY2d 1046, 1048, affg 80 AD2d 535.) But, "defendant was not in the immediate area in which the drug sale and arrests were taking place" (80 AD2d, at p 537 [Carro, J., dissenting]) and there was no need for the prosecutor to bring out the "buy and bust" operation in either his opening statement or his questioning of the arresting officers. The probative value of this evidence — that is, its direct relevance to defendant's guilt of the crimes for which he was being tried — was nil. All that need have been said by the officers as "background" information was that they were at that location because of an unrelated investigation and that when they received orders from their superior officer, they detained everyone in the immediate area. "It is axiomatic that evidence of uncharged crimes may be introduced only when the testimony is relevant and necessary to the prosecution's case (*People v Molineaux,* 168 NY 264; see *People v Stanard,* 32 NY2d 143). Moreover, in determining the admissibility of such evidence, a balance must be struck between the probative value of the testimony in connection with the crimes charged and the danger of undue prejudice

---

[*] Defendant's counsel broke into the Assistant District Attorney's *opening statement* and carefully put his objection on the record. The objection was overruled and an exception was taken. No matter what counsel later did or elicited as testimony, this objection was sufficient to preserve the issue for our review. (Cf. *People v White,* 53 NY2d 721, 722-723; CPL 470.05, subd 2.) Additionally, counsel moved for a mistrial both at the conclusion of the People's case and at the conclusion of all evidence.

to the defendant (*People v Schwartzman,* 24 NY2d 241, 247)." (*People v Cook,* 42 NY2d 204, 208; see, also, *People v Jones,* 62 AD2d 356, 357 [prejudicially "placed before the jury proof of possible other crimes, having no apparent relationship to the crime charged"] [per Fein, J.].) The prejudice here is obvious. Defendant was charged with possessing less than two ounces of cocaine and a Smith and Wesson revolver, a type commonly used by policemen. His defense was that he was charged with drug possession because the arresting officers thought he had obtained the gun by harming a police officer. Thus, his actions prior to arrest were unrelated and irrelevant to any issue he himself was raising, and the sole purpose of the prosecutor's evidence of the surveillance operation was to provide a logical nexus which did not, in fact, exist: that appellant was a cohort of Zurita and Perez in their sale of $75,000 worth of cocaine to the undercover officers and thus had every reason to be in possession of a gun and cocaine. (Cf. *People v Green,* 35 NY2d 437, 442; *People v Le Grand,* 76 AD2d 706, 708-709 [evidence of uncharged crimes inadmissible except as explanation for some *material* fact].)

The People make the specious argument that the bulk of the details regarding the larger "buy and bust" was elicited through defense counsel's cross-examination. Obviously, once faced with the prosecutor's opening statement and the officers' testimony, counsel was obliged to try and minimize its impact.

Likewise, defendant's testimony as to his own actions prior to being arrested was no more than a response to evidence placing him in the middle of a drug ring. It did *not* open the door for the prosecutor's "rebuttal" evidence that (1) there was no soda machine from which appellant could have bought a can, or (2) he did or did not answer questions about his prior education when later interrogated. These collateral issues pertain not a whit to whether defendant possessed drugs or a gun, and "[i]t is axiomatic that the prosecutor may not introduce extrinsic evidence to contradict a witness' answer concerning collateral matters." (*People v Galletti,* 55 AD2d 154, 157 [per Birns, J.]; see *People v Milom,* 75 AD2d 68, 75 [Murphy, P. J., dissenting]; *People v Lizzarra,* 70 AD2d 572.) Not being "inextricably

interwoven with the crime charged" (*People v Vails*, 43 NY2d 364, 368), it was prejudicial error to venture into those areas. (Accord *People v Schwartzman*, 24 NY2d 241, 245; Richardson, Evidence [10th ed], § 491.)

Accordingly, the judgment rendered September 21, 1981 in Supreme Court, New York County (Fritz W. Alexander, J.), convicting defendant of criminal possession of a controlled substance in the second degree should be reversed, on the law, and that count in the indictment dismissed.

FEIN, J. (dissenting). Defendant was indicted for criminal possession of a controlled substance in the second degree and two counts of criminal possession of a weapon in the third degree. The issue of whether he possessed the weapon and the drugs was a narrow one. The question was one of credibility as between the officers' testimony concerning defendant's possession of the contraband items, and defendant's explanation. This was all that should have been presented to the jury for resolution.

However, the defendant was actually tried for being part of an extensive drug operation. The description of the trial in the majority opinion demonstrates this conclusively. The bulk of the testimony related to the big drug operation, the objective of the Task Force.

It cannot be disputed that some evidence of other crimes may be admissible, when required as background material (*People v Montanez*, 41 NY2d 53). However, this does not justify the expansive story revealed here where the evidence of collateral matters clearly outweighed the relevant evidence. Such extraneous evidence resulted in undue prejudice to the defendant (see *People v Schwartzman*, 24 NY2d 241, 247, cert den 396 US 846). Much of the testimony was irrelevant. Even relevant evidence may be excluded when its prejudicial effect will outweigh its probative value (*People v Jones*, 62 AD2d 356, 357).

Admission of this testimony placed before the jury proof of possible other crimes, having no real relationship to the crimes charged, namely, possession of a weapon and a controlled substance. The case as tried was participation in the illicit sale of drugs as a business, not the limited issues tendered by the indictment.

. The evidence was inadmissible for the very reason that it tended to show defendant was participating in some manner in an expansive and continuous business of selling narcotics, involving one or more uncharged crimes (*People v Jones,* 62 AD2d, at pp 357-358).

The prejudicial effect of the testimony plainly outweighed its probative value. It is of no significance that, after the able and experienced Trial Judge indicated on the openings that the People would be permitted to introduce evidence of the larger operation as background, defendant's attorney on cross-examination asked questions which unfortunately added to the prejudicial background material. In face of the court's ruling, he had no other option (*People v Jones, supra*).

The collateral matter introduced on rebuttal went solely to credibility and was improperly received. It was not "inextricably interwoven with the crime charged" (*People v Vails,* 43 NY2d 364, 368) and was prejudicial (*People v Schwartzman,* 24 NY2d, at p 245).

In my view, defendant was denied a fair trial. Judgment should be reversed and a new trial ordered.

Asch and Kassal, JJ., concur with Ross, J. P.; Carro and Fein, JJ., dissent in separate opinions.

Judgment, Supreme Court, New York County, rendered on September 21, 1981, affirmed.