THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOHN E. GLEASON, JR., Appellant.

First Department, December 21, 1954.

*James F. Ryan* of counsel (*Harold Shapero* with him on the brief), for appellant.

*Richard G. Denzer* of counsel (*Charles W. Manning* with him on the brief; *Frank S. Hogan, District Attorney*), for respondent.

BOTEIN, J. Defendant John E. Gleason was convicted, after trial in the Court of General Sessions, on each of the four counts in an indictment charging him with the crime of perjury in the first degree. He was accused of giving false testimony before a Grand Jury that was investigating a conspiracy to extort money from contractors in the business of installing oil burner systems in buildings located in the city of New York.

On the trial the District Attorney staked out distinct chronological boundaries in the presentation of his proof. The first part relates to the formation of the illegal scheme in 1947 and its operation until November 10, 1950, all this time under the protection and leadership of First Deputy Fire Commissioner Moran. This period of the racket's operation shall be called the " Moran conspiracy ". It is conceded that defendant had no part whatsoever in the Moran conspiracy.

In the People's pattern of proof, November 10, 1950, marks the date of defendant's unequivocal entrance into the conspiracy, and the assumption of the role relinquished by Moran by defendant and another more powerful political figure. Defendant had occupied a post of some importance in the campaign of a newly elected Mayor. Moran, who was in a different political camp, withdrew from the conspiracy with the philosophical observation that " to the victor belongs the spoils ". The second phase of the racket, and its operation under the alleged leadership of a political leader shall be called the " second " conspiracy. The second conspiracy was aborted in a few months due to the Grand Jury investigation.

The People claim defendant committed perjury when he testified before the Grand Jury investigating the conspiracy; more specifically, when he denied certain conversations and acts in furtherance of the second conspiracy attributed to him by the People's witnesses. The first three counts are based on defendant's denials that he met with two or more of his alleged co-conspirators on three separate occasions and had conversations relating to the continuing operation of the extorsive scheme. The fourth count relates to defendant's denial that one of the conspirators delivered pay-off money to him.

The People introduced a good deal of testimony concerning the original Moran conspiracy. Four employees of the fire department, Smith, Keohane, Power and Crew, testified in some detail about the institution in 1947 of a scheme to " bury " applications for permits for installation of fuel oil storage tanks unless and until the contractors made specified payments. They testified that Moran provided a schedule for payments, fixed in

accordance with the size of the tank to be installed. There was also testimony about the necessary transfers of firemen in the department so that they would occupy strategic positions in the conspiracy, the broadening of the scope of operations, the provisions for handling complaints, the amounts collected each week, the amounts retained by the firemen and then transmitted to Moran, and the instructions given by Moran for the conduct of the racket. Defendant took no part in the Moran conspiracy, and for aught that appears in the record, until its closing days had no knowledge of its very existence; nor, it follows, of the acts and conversations which took place in his absence.

It may be that this testimony, in and of itself, was not so unnecessarily prejudical to defendant as to warrant reversal. The court received it to establish the background of the extorsive scheme which functioned under Moran until November 10, 1950; and which allegedly continued under the protection of defendant and another person after defendant joined the conspiracy. Some evidence of the nature of the structure and operation of the scheme was necessary to make the subject matter of defendant's alleged perjury intelligible to the jury. Without it, the jury would have to consider defendant's alleged acts and conversations truncated from essential underlying proof. At various times, when objection was made, the Judge was painstaking to instruct the jury that such evidence was not binding on the defendant and was received only to show the background of the crime with which defendant was charged. This instruction was repeated when the case was submitted to the jury.

Without some background evidence the jury could not knowledgeably consider the sharply disputed perjury issues drawn from defendant's alleged participation in the second conspiracy. For that limited purpose minimal evidence could properly be received (*People* v. *Duffy,* 212 N. Y. 57, 65–66; *Heike* v. *United States,* 227 U. S. 131, 145; *Terry* v. *United States,* 51 F. 2d 49, 52; *Egan* v. *United States,* 137 F. 2d 369, 381–382). It goes without saying that the introduction of such evidence must be carefully monitored by the trial judge, as it is an accommodation that the general rules of evidence must at times make to the exigencies of the particular instance. It is difficult to enunciate rules in anything but the most general of terms. Too much depends on the cast of the particular case and the techniques employed by the particular judge in guiding and instructing the jury. Background material of this nature is received as an explanatory preamble to the evidence on which the guilt or innocence of the defendant will be determined.

Every precaution must be taken lest it spill over its barriers and distort the jury's contemplation of the determinative and critical evidence.

It is clear that in this case the District Attorney in good faith introduced only such explanatory proof as he considered essential to a proper understanding of his main case; and a conscientious Judge strove skillfully to inform the jury of its limited application. However, since we shall set aside this verdict and judgment and order a new trial on other grounds, we deem it appropriate to comment that, in our opinion, too great a volume of evidence was introduced relating to the Moran conspiracy. The *modus operandi* and the dramatis personæ of that racket can be sketched quickly by only one participant. There is no purpose served by the redundant and prolonged recitals by all the recanting firemen of their actions and conversations in furtherance of their conspiracy. Any choice in the presentation of background proof should be exercised in favor of abridgement.

Otherwise, as happened here, defendant's counsel may be drawn into cross-examining each witness at great length on his background testimony. In this case the so-called explanatory evidence consumed an inordinately large part of a protracted trial. We would like to believe that all through the trial, obedient to the court's instructions, such evidence remained in a compartment of each juror's mind labeled " Not binding on the defendant "; and that no part ever leaked into another compartment to be weighed in the balance against the defendant. But we suspect that reliable allocation of so great a volume of proof could occur only in the never-never land of legal theory. " Perhaps even at best the safeguards provided by clear rulings on admissibility, limitations of the bearing of evidence as against particular individuals, and adequate instructions, are insufficient to ward off the danger entirely." (*Blumenthal* v. *United States,* 332 U. S. 539, 559.) We think that the scope of the testimony concerning the Moran conspiracy may well have confused the jury and prejudiced defendant.

We now consider the evidence of the second conspiracy — the one in which the People claim defendant played a major role. Power, an employee of the fire department who is claimed to have acted as liaison between the other firemen and defendant, testified that on November 10, 1950, defendant informed him that payments to Moran were to stop and from then on were to go to one Sampson. Sampson was a political leader in the higher ranks of the victorious Experience party — under whose banner

the new Mayor had been elected. Power passed this direction on to Keohane, who in turn notified Smith. Smith and Keohane had been the chief lieutenants of Moran.

The firemen conspirators were sorely beset. They were collecting $2,000 a week from this three-year-old, well-grooved racket and wanted to be sure that they turned these proceeds over to the right people — meaning powerfully placed persons who could offer them the same kind of protection given by Moran. They prized Moran's advice — which they testified was given them in the absence of defendant — to deal only with someone at the top. Evidently distrusting Power's representations, they sought some assurance that he spoke for Sampson and that defendant was next below Sampson in the echelon of protection. Power thereupon took Smith and Keohane to Sampson's office, where, it was testified, they were assured by Sampson, in the absence of defendant, that they were dealing with the high command and that Power was his man.

When it came time to turn over the first payment Smith and Keohane insisted on further assurances. Power allegedly arranged a meeting in a hotel dining room with defendant, who questioned them about the setup, told them to continue it and to turn the money over to Power. Defendant also instructed Power to hold the money in a safe-deposit box until further advice.

Before the Grand Jury and at the trial, defendant testified that he had met the firemen without appointment and by chance in the dining room, but he denied that there was any conversation relating to the fuel oil racket or the disposition of its proceeds. The first count of the indictment is based upon these denials of the defendant before the Grand Jury.

Shortly after this meeting word came to the firemen that the District Attorney had commenced an investigation into the extorsive scheme. The firemen were worried and naturally looked to their patron protectors for advice and comfort. Power claims he arranged two meetings with defendant, at which the latter assured various firemen that nothing would come of the investigation and to continue operations. Before the Grand Jury and at the trial, defendant denied holding any such conversation, and these denials form the basis of the second and third counts. The fourth count charges delivery of $12,000 of accumulated proceeds of the conspiracy to defendant and that he denied receiving these funds before the Grand Jury.

The foregoing is the barest summary of the evidence upon which the People charged defendant with perjury. There was detailed testimony by the conspirators of conversations they

held among themselves, in the absence of defendant — conversations in which they worriedly discussed the feasibility and means of continuing the scheme, in which they discussed the kind of proof they required to insure that they were dealing with the man at or near the top in the new regime.

They testified also about conversations, all held in the absence of defendant, in which Power brought back directions purporting to emanate from defendant about the operation of the racket and methods of payment. Then they testified about their frantic conferences, their worryings and scurryings when the investigation started; and of assurances and reassurances, given to them by Power and purporting to come from defendant and Sampson. On occasion Power even told them that the Mayor, fire commissioner and District Attorney had promised to stop the investigation — although there was no basis whatever for such statements. He testified blandly at the trial that these were figments of his imagination designed to calm the apprehensions of his co-conspirators.

All of this testimony, and much more in similar vein, was received over objection of counsel and without instruction that it was not binding on defendant. In short, evidence of these acts and conversations, done and held in the absence of defendant, was admitted as fully and freely as though this were the trial of a conspiracy to extort.

To make proof in support of a conspiracy competent and admissible it is not necessary that the crime alleged in the indictment should be labeled a conspiracy, if the substantive crime actually charged resulted from a conspiracy (*People* v. *McKane,* 143 N. Y. 455, 465, 470; *People* v. *Storrs,* 207 N. Y. 147). But there is no claim here that anyone collaborated with defendant in furtherance of a common design that he commit perjury. In fact, his alleged coactors in the extorsive conspiracy gave him the lie before the Grand Jury. And so, if this testimony is to be allowed, it must find its justification in terms of the perjury here charged, which is not conspiratorial in nature or in origin.

The working issues of fact presented upon the trial were whether the interviews and conversations about which defendant was alleged to have lied did in fact take place. The District Attorney contends that the meetings and conversations among Power and the firemen were offered only as circumstantial explanation of the subsequent interviews with defendant and therefore bear upon the controlling issues. He also offers them as an indication of each speaker's state of mind — meaning,

we assume, the initial desire for a powerful protector and the subsequent apprehension caused by the investigation. He argues, perforce, that the conversations among the firemen and Power were not offered as evidence of the truth of the assertions of the various speakers and are therefore not subject to the inhibition of the hearsay rule. (See 6 Wigmore on Evidence [3d ed.], §§ 1766, 1790; *People* v. *La Barbera,* 274 N. Y. 339, 346; *Terry* v. *United States,* 51 F 2d 49, 52, 53, *supra,* and *Commonwealth* v. *Ricci,* 332 Pa. 540, 544–545.)

Thus stripped, one inquires whether there was reasonable balance between the importance of these conversations to the prosecution's case and their potential for prejudicing the defendant's case. In his alleged conversations with defendant himself Power told him fully why the firemen wanted to meet with him; and also explained the current status of the extorsive scheme. And in the course of their alleged conversations with defendant the firemen reiterated this explanatory information. No objection was or could be taken to such testimony. Most of the challenged conversations were cumulative or paralleled competent testimony given by the People's witnesses on the stand.

But however valid the District Attorney's arguments as to the non-hearsay character of these conversations might be under other circumstances, they simply were not submitted to the jury in properly circumscribed form. As this testimony poured in, no effort was made to advise the jury of its limited applicability, and that the out-of-court statements of the extortion conspirators were not offered as evidence of their intrinsic truth. Repeatedly, in his summation, the prosecutor quoted and referred to the subject matter of statements made by the firemen and Power in the absence of defendant; and he referred to them not only as circumstantial background and proof of the speakers' states of mind, but also as proof of the truth of the assertions themselves. One of the final instructions given the jury by the court was similar in purport and would justify the jury in regarding the testimony under review as offered to prove, as true, the statements made outside the presence of defendant.

It will be recalled that in connection with the admission of background testimony relating to the Moran conspiracy, the court carefully and repeatedly instructed the jury that it was not binding on defendant. In his main charge the Judge repeated that " any testimony referring to matters or conversations prior to November 10th, 1950 cannot be considered as binding on the defendant Gleason.'' Then, when counsel for defendant

requested him to charge that conversations and acts not in the presence of defendant were not binding on him, the Judge stated:

" I have given that charge with respect to such matters occurring prior to November 10th, 1950.

" I decline to give that charge with respect to such matters occurring thereafter."

This, as we view it, was tantamount to charging that all acts done by the conspirators and all conversations held among them after November 10, 1950, were binding on defendant. In its context it was broad enough to impute binding effect to the hearsay as well as non-hearsay aspects of the statements under discussion — particularly when considered with the numerous objections taken to the introduction of such testimony during the course of the trial. But as hearsay these statements may not be received to implicate defendant directly in the conspiracy.

The declarations of the co-conspirators made in the absence of defendant may not be received in this case as admissions under the standard exception to the hearsay rule based on the theory that they acted as agents of defendant. Of course, the firemen were not agents of the defendant in the execution of any joint enterprise to commit perjury. This was tried as a solo felony, not as the substantive outgrowth of a developing, progressive conspiracy to commit perjury; and there are no other circumstances in the trial of this charge to justify the application of any other exceptions to the hearsay rule that would make these acts and conversations admissible against an absent defendant.

The District Attorney also points out that Power reported back to defendant the substance of many of the conversations he held with the firemen, and contends that the communication of these conversations to defendant renders them admissible, citing as authority *People* v. *Becker* (215 N. Y. 126, 153). However, the conversation brought home to Becker was authorized by him and was part of a concerted arrangement to commit murder; and the conversations allegedly brought home to defendant in this case do not relate to any arrangement to commit perjury.

It must always be borne in mind that defendant has been indicted for perjury. The two-witness rule, rooted deep in the tradition that a conviction for perjury should not be obtained solely on the evidence of a single witness, was designed to make convictions for perjury more difficult to obtain than in the case of most other crimes (*Weiler* v. *United States,* 323 U. S. 606,

609). Nevertheless the prosecution presented its proof as though this were in fact the trial of a charge of extortion; and under the court's instructions the jury could find that the acts and statements of the extortion conspirators were just as binding on defendant as though he were in fact accused of extortion. This is error into which court and prosecutor can easily slip when an extortion conspiracy is so inextricably intertwined with the alleged perjury. In such a context the testimony now claimed to be admissible because its nexus of relevancy was proof of circumstantial background and state of mind, was treated at the trial as proof of guilt and wrongdoing.

As to the error ascribed to the court's charge that the testimony alleged to be false was as a matter of law material to the inquiry conducted by the Grand Jury, the parties are referred to the opinions of this court in *People* v. *Clemente* (285 App. Div. 258).

For the reasons stated, the judgment of conviction on the first three counts should be reversed and a new trial ordered. Only one witness testified in support of the fourth count, and his testimony was uncorroborated. Accordingly, the judgment of conviction as to that count should be reversed and the count dismissed.

The order of May 8, 1953, appealed from should be affirmed.

Dore, J. P., Callahan, Bastow, and Bergan, JJ., concur.

Judgment on the first three counts unanimously reversed and a new trial ordered. Only one witness testified in support of the fourth count, and his testimony was uncorroborated. Judgment as to that count unanimously reversed and the count dismissed. The order of May 8, 1953, is unanimously affirmed. Settle order on notice.