THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
DEVERNON LE GRAND and STEVEN LE GRAND, Also Known
as STEVEN STRAUN, Appellants.

Second Department, September 29, 1980

## APPEARANCES OF COUNSEL

*William E. Hellerstein (Alan S. Axelrod* of counsel), for Steven Le Grand, appellant.

*Devernon Le Grand,* appellant *pro se.*

*Eugene Gold, District Attorney (Michael Gore* of counsel), for respondent.

## OPINION OF THE COURT

MOLLEN, P. J.

Following a long and often acrimonious trial, the defendants were convicted of the murders of 17-year-old Yvonne Rivera and her 18-year-old sister, Gladys Rivera Steward. The prosecution alleged that the defendants killed the two young women on the premises of the St. John's Church of The Lord in which defendant Devernon Le Grand and some 60 to 80 other people resided. It was further alleged that, after the homicides, Devernon Le Grand and one Frank Holman removed the dismembered bodies of the women from the Brooklyn church where they were killed to the Sullivan County farm which Le Grand owned. There Le Grand and Holman allegedly burned the bodies in a bathtub and then disposed of the bones in the waters of a nearby river.

The People's case included proof of inculpatory statements made by each of the defendants to members of the group that lived in the church. Also presented was tangible evidence consisting, *inter alia,* of bone fragments recovered from the river. The prosecution's chief witness, however, was Frank Holman who, having been granted immunity, testified as to his observations on the night of the crimes and described the assistance he gave to defendant Devernon Le Grand in disposing of the bodies. In this latter regard, Holman's testimony was corroborated in large part by discoveries made by the police in Sullivan County.

The defense did not dispute that the two women had been murdered or that their bodies had been burned and disposed of in Sullivan County. Instead, it was the defense's contention that those crimes had been committed, not by the defendants, but by one Darryl Steward, the husband of one of the victims. According to the defense, Steward had accomplished the killings with the help of the prosecution's own witness, Frank Holman. In support of these contentions, the defense called Steward himself who testified without hesitation that he had

in fact murdered and dismembered the two sisters and had done the same to other women as well. And in a startling turn of events at trial, Steward actually produced in court several bones which he claimed to be the amputated fingers of one of his other victims.

As the guilty verdicts make clear, however, the jury rejected Steward's confession and concluded beyond a reasonable doubt that the defendants had committed the crimes. Each defendant was sentenced to a term of from 25 years to life imprisonment, and it is from these judgments that they now appeal.

■ Both judgments should be affirmed.

The defendants' primary challenge is directed at the introduction of what they claim to be irrelevant and prejudicial trial testimony concerning the life-style, religious beliefs, and moral values of members of the community that lived in the church. The Assistant District Attorney elicited from both prosecution and defense witnesses that defendant Devernon Le Grand was the undisputed leader of the church "family". It was shown that, at his direction, women and young girls, some of whom had been compelled to drop out of school, solicited funds on the street while wearing nun's clothing. Money collected through this activity was turned directly over to Devernon Le Grand, who alone administered all church funds. There was also evidence that, although these contributions were sought by women dressed in clerical garb ostensibly for the purpose of supporting church work, relatively little religious activity actually took place within the church. Instead, Le Grand used the money, not only to supply food and clothing for his coterie, but to pay for expensive gifts, cars and trips for favored members of the group.

Additionally, the prosecutor was permitted to make some inquiry into the sexual habits of members of the community, and particularly of Devernon Le Grand. It was established that he had himself fathered approximately 60 children by several different women associated with the church. Of these children, approximately 25 to 30 continued to reside with him.

The defendants argue that the foregoing evidence was both irrelevant and prejudicial, and could have had no effect other than to suggest to the jury that the defendants were guilty of the charged crimes because of their association with the unorthodox and aberrant practices of the church community. We disagree.

■ It is of course settled law that evidence of uncharged

crimes or of unrelated immoral behavior is inadmissible if offered solely to raise an inference that the defendant is of a criminal disposition and is therefore likely to have committed the crime charged. (See, e.g., *People v McKinney,* 24 NY2d 180, 184.) However, such evidence may be admitted as background if it is relevant to establish or explain some material fact. (See *People v Green,* 35 NY2d 437, 441-442.) The extent to which such evidence may be received is a matter lying largely within the discretion of the trial court which must carefully weigh its probative value against the danger that it will unduly prejudice the defendant. Whether there was an abuse of the trial court's discretion will necessarily depend upon the circumstances of the particular case. (See *People v McGrath,* 46 NY2d 12, 32; *People v Gleason,* 285 App Div 278, 281-282; see, also, *People v Stanard,* 32 NY2d 143, 146.)

■ The case at bar was an extraordinary one in many respects. It was alleged, for example, that the defendants had committed the murders in the church while virtually the entire group was on the premises. There was evidence that, at the direction of Le Grand, most or all of the church members gathered in a front room of the building to attend a "party". Le Grand then separately summoned each of the victims out of the room, and neither was ever seen alive again. According to testimony adduced at trial, men were posted at the doors of the room as guards and no one was permitted to leave for several hours, not even to go to the bathroom. In the course of the party, screams were heard and Holman, who was acting as one of the guards, exited the room to find the defendants carrying a body.

The defense attempted to dispute this evidence and, consequently, the jury was left to face the question of why some 60 people would submit to being confined in one room of the church, deprived even of the opportunity to go to the bathroom, and why the defendants would commit the crimes in such a way as to permit those people, each a potential witness, to hear the screams of the victims. Even more troublesome was the testimonial confession of Darryl Steward. The entire defense rested on the contention that Steward, rather than the defendants, had killed the young women, and the jury was necessarily called upon to determine, *inter alia,* why, if the defendants were guilty as charged, someone else would falsely incriminate himself in open court, willingly inviting a conviction for a murder he did not commit.

To resolve these questions, the prosecution postulated that the submissive conduct of the church community on the night of the murders, the readiness with which the defendants admitted their acts to persons within the group, the casual disregard with which the defendants treated the possibility that church members would learn that two of their number had been murdered, and the confession of Darryl Steward were all products of the virtually total dominance and control that Devernon Le Grand exerted over the group. Evidence demonstrating that dominance and control was therefore relevant to a crucial issue in the case. (Cf. *People v Doody,* 172 NY 165, 175.) The apparent willingness of the group's women and girls to don religious clothing and solicit money on the streets for Le Grand, the fact that he was the acknowledged arbiter of the mores of the group, and the filial bonds he had with a large number of those residing at the church all tended to establish that he did in fact enjoy a disproportionate influence over the lives of his followers. In light of the extraordinary and indeed almost unparalleled circumstances of the case, therefore, we cannot conclude that the trial court abused its discretion in permitting the People to elicit some background evidence relating to the community with which the defendants were associated. (See *People v Manson,* 61 Cal App 3d 102, 131, cert den 430 US 986.) Clearly, this was not an instance where a broad attempt is made to discredit the accused by showing his affiliation with a group held in general disfavor by the community. (Cf. *People v Kenyatta,* 17 AD2d 659.) Rather, this may well be seen as one of those cases which are "sufficiently complex that the jury would wander helpless, as in a maze, were the decisive occurrences not placed in some broader, expository context" *(People v Green,* 35 NY2d 437, 441-442, *supra;* see, also, *People v Silva,* 66 AD2d 662, 663). Moreover, we disagree with the defendants' contentions that the amount of evidence received on this subject was excessive. Finally, and importantly, we note that although the evidence complained of tended to show acts of an unusual and perhaps immoral nature, they were not such as to demonstrate a propensity to commit the brutal murders of which the defendants stood charged. (Cf. *People v McCray,* 60 AD2d 895.)

We have reviewed the remaining claims of error asserted by the defendants and conclude that any errors which may have been committed, whether viewed singly or cumulatively, did not deprive the defendants of a fair trial.

MARGETT, O'CONNOR and WEINSTEIN, JJ., concur.

Two judgments (one as to each defendant) of the Supreme Court, Kings County, both rendered May 6, 1977, affirmed.