■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DWAYNE BROWN, Appellant.—Judgment of the Supreme Court, New York County (Allen Alpert, J.), rendered April 27, 1989, convicting defendant, after jury trial, of criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]) and sentencing him to an indeterminate term of imprisonment of from 3½ to 7 years, affirmed.

Defendant contends that the court improperly admitted into evidence testimony relating to reports made by civilian witnesses to the arresting officers regarding a man, dressed similarly to defendant, who was seen brandishing a sawed-off shotgun in DeWitt Clinton Park shortly before the arrest. Defendant's position, with which the dissent agrees, is that admission of this evidence of an uncharged crime was unnecessary and beyond the permissible grounds of background material and therefore constitutes an abuse of discretion by the Trial Justice. In our opinion, the strategy employed by defense counsel required that the disputed evidence be heard by the jury in order for the actions of the arresting officers to be viewed in the proper perspective, and its admission was not an abuse of discretion (People v Le Grand, 76 AD2d 706, 709).

Defendant was arrested by Housing Police Officers Joseph Dicanio and George Switzer in the presence of three other men. Two of these men, Cesar Quinones and Jose Valenzuela, testified on defendant's behalf at trial. They stated that, in the course of playing basketball in DeWitt Clinton Park, the police shone a light on the three men as they sat on a park bench and asked what they were doing. Lewis stated that he felt the policemen were harassing them and identified one of the officers as George Switzer. They then left the park and went to sit in front of 535 West 51st Street. They saw defendant across the street with his girlfriend and called to him to join them. They testified that, about 20 minutes later, they observed the same police officers drive the wrong way along West 51st Street. The officers exited the police car with their guns drawn and, with no explanation, ordered the four men to stand with their hands up against the wall while they looked under a car parked at the curb. Quinones testified that one of the officers looked in the bushes on either side of the building before locating a white bag with a sawed-off shotgun inside. Lewis, however, testified that the officer went right to the spot where the bag was located. Both denied seeing defendant carrying the bag. The witnesses further stated that the four men were not told why they were being arrested until they had been placed in police cars.

Prior to the delivery of opening statements, the Trial Justice ruled that the People would not be permitted to introduce either the fact that the police officers had conversations with civilians in the park or the substance of those conversations concerning a man with a gun. Defense counsel then informed the court of his intention to cross-examine Officer Switzer regarding a 1987 departmental suspension for the unautho-

rized discharge of his firearm while off duty and the underlying facts of that incident. The court informed defense counsel that if Officer Switzer were asked questions bearing upon his conduct as a police officer, the People would be entitled to establish the circumstances surrounding the officers' approach to the suspects with weapons drawn.

It is apparent that it was defense counsel's strategy to characterize Officer Switzer and his partner as "cowboys", overly aggressive police officers, who set upon a peaceful group of men for no apparent reason. Darryl Lewis' testimony that one of the officers went right to the spot where the bag containing the shotgun lay, when taken together with his testimony that the officers had harassed him and his two companions earlier that night, implies that the evidence was planted. The cross-examination of Officer Switzer about firing his weapon into the air five times in an off-duty incident was clearly designed to cast doubt on the credibility of his version of the events surrounding the arrest and to suggest his need to supply evidence to justify his armed approach to the suspects.

In view of the highly selective portrayal of events presented by the defense, the jury could be expected to speculate as to the source of the police officers' knowledge of the presence of a shotgun at the scene of the arrest *(People v Hernandez,* 139 AD2d 472). Evidence that a man with attire matching the defendant's was earlier seen displaying a shotgun in the park, causing people to scatter for the exits, provides a much-needed perspective. This information combined with the officers' testimony that, when they approached the group gathered in front of 535 West 51st Street, defendant threw a white bag into the shrubbery is pertinent to dispel any notion that the police may have employed illegal methods to obtain a conviction and then lied about the incident in an attempt to conceal their wrongdoing. Therefore, the evidence was received for the purpose of completing the narrative and enhancing the jury's understanding of the crime charged *(People v Hernandez, supra).* The probative value of the background evidence received outweighs any prejudice to defendant *(People v Ventimiglia,* 52 NY2d 350, 359; *People v Fay,* 85 AD2d 512). Finally, we note that the Trial Justice provided numerous cautionary instructions that the purpose of the evidence was to afford a complete picture of the surrounding events *(see, People v Montanez,* 41 NY2d 53, 58; *People v Fay, supra).*

There is some question as to whether Officer Switzer's departmental record, containing details of his suspension, has

any bearing upon defendant's guilt or innocence insofar as it might reveal any bias, prejudice or ulterior motive relating to any issue or person involved in the case *(People v Gissendanner,* 48 NY2d 543, 548; *People v Chang Gee Kim,* 144 AD2d 572, 574). However, having succeeded in introducing confidential information from the officer's departmental record, defendant cannot complain that the People were afforded the opportunity to introduce evidence supporting the propriety of his conduct on this occasion. Moreover, defense counsel was cautioned concerning the implications of his proposed strategy and chose to employ it nevertheless.

As to defendant's other contentions, the civilian reports to police of a man with a gun are not hearsay because they were not offered for the truth of the statements *(People v Inman,* 80 AD2d 622). Moreover, any error must be considered harmless in view of the overwhelming evidence of defendant's guilt *(People v Crimmins,* 36 NY2d 230). Given the seriousness of the crime and defendant's criminal history, it also cannot be said that his sentence to the maximum term is excessive. Concur—Kupferman, J. P., Milonas, Ellerin and Rubin, JJ.

Carro, J., dissents in a memorandum as follows: The essential issue, in this fact-based case, is whether the defense was entitled to question one of the arresting officers about certain bad acts without triggering a counterattack by the People concerning evidence of uncharged criminal conduct by the defendant. Because I believe that the defense should have been permitted to elicit the information concerning the relevant bad acts of the officer without such a *quid pro quo,* I would hold that the court erred when it allowed into evidence the lengthy and detailed account of the uncharged crime.

Defendant was indicted for, and convicted of, criminal possession of a weapon in the third degree. Therefore, the issue of whether he possessed the weapon was a narrow one. This was a simple case for the People, with uncomplicated facts. The testimony regarding events leading to defendant's arrest is as follows.

Shortly before defendant's arrest, a young unidentified woman allegedly told arresting officers, Joseph Dicanio and George Switzer, that a dark-skinned black man wearing a blue sweat suit or jogging suit had been waving a shotgun in Clinton Park on 11th Avenue and 51st Street. The woman allegedly declined to tell the officers her name, because she was in a methadone program and "did not want to get involved."

After receiving this tip, the officers drove through the park, looking for a suspect. They soon exited their vehicle, separated, and asked people in the park if they had seen anything. Switzer testified that one man told him he had seen a black man, wearing a blue jogging suit and toting a shotgun, leave the park, proceeding eastward.

The officers returned to their vehicle and began to canvass the area, although they did not turn on their lights and sirens. Two blocks from the park, they observed a group of people standing on the north side of West 51st Street. Switzer, the operator of the vehicle, turned and drove the wrong way up the street, allegedly because there was neither vehicular nor pedestrian traffic. In the middle of the block, in front of 535 West 51st Street, were four men. One of these men was defendant, who was wearing blue pants and a shiny blue tee shirt, and who had his back to the approaching police car. Both officers testified that as they approached, defendant threw a white bag towards the shrubbery in front of the building.

Upon making this observation, Switzer and Dicanio, with their guns drawn, emerged from their vehicle and ordered all four men to stand with their hands against the building. Switzer searched the bushes near the building; this yielded a bag containing a shotgun and two shells. Defendant was arrested and charged with criminal possession of a weapon.

Defendant's companions, Jose Valenzuela, Cesar Quinones and Darryl Lewis, were arrested for disorderly conduct because they were protesting defendant's innocence and allegedly yelling obscenities. At trial, both Quinones and Lewis testified that they had not seen defendant in possession of the bag containing the gun. Lewis further testified that Quinines, Valenzuela and himself had been playing basketball across the street from 535 West 51st Street for a period of 20 minutes prior to the arrest, while defendant and his girlfriend were across the street. Shortly before the arrest, they joined defendant, and the four men stood there talking in front of the building, in which Quinones resided, until the police arrived.

It is of great import herein that in the course of Switzer's direct testimony, the prosecutor elicited that in 1987, during Switzer's four-year tenure with the Housing Police, he was disciplined for discharging his off-duty service revolver in the air. Indeed, he fired his gun *five times* into the air; the only reason he gave at trial for this reckless act, which took place

while he was off duty, was "stupidity". For this, Switzer received a 25-day suspension.

On summation, the prosecutor made references to and dwelt upon the Clinton Park incident and the identical nature of the description of that man and defendant, who, while arrested for and charged with the instant offense, was not charged with any offenses relating to the Clinton Park incident.

As the People correctly note in their responding brief on this appeal, "the sole issue [at trial] was whether defendant possessed [the shotgun] and that required the jury to evaluate the credibility of the People's witnesses versus the credibility of the defense witnesses." The People here had a very straightforward case, which need not have been complicated by rulings which permitted the introduction of identical uncharged crimes of defendant. In this regard, it is appropriate to examine the relevant rulings.

Prior to opening statements, the court ruled that the People would not be permitted to introduce either the fact that the police had had conversations with the civilians in and near Clinton Park or the substance of those conversations, provided that defendant did not place in issue the manner in which the police approached him. However, when defense counsel stated his intention to cross-examine Switzer regarding his 1987 suspension for unauthorized discharge of a firearm and the underlying facts therein, conduct which I believe constituted the crime of reckless endangerment in the first degree, a class D felony (Penal Law § 120.25), the court imposed a *quid pro quo*. The court warned counsel that should this information concerning Switzer be elicited, it would be: "entirely appropriate to permit the People to establish the reason for the officer's approach in this case with their guns drawn; that reason being allegedly and assertedly the information received by the police officers from the one or two civilians before they confronted [defendant]." The court also stated that it did not want conveyed to the jury that Switzer was "a cowboy, that is an overly aggressive police officer." Thus, the *quid pro quo,* with instructions as to how the additional evidence against defendant should be used, was fashioned. As a result, the court allowed the jury to receive, via Switzer and Dicanio, a lengthy, exquisitely detailed recitation of the events in Clinton Park.

This constituted reversible error. First, I am at a loss as to why eliciting Switzer's bad acts gave rise to a *quid pro quo*. It appears to me that defense counsel was entitled to elicit the information in question. *(See, People v Gissendanner,* 48 NY2d

543, 547-549 [1979].) The testimony regarding Switzer's prior bad act may have been a fair way to impeach his credibility. *(Cf., People v Brockington,* 126 AD2d 655, 656 [2d Dept 1987].)

In any event, under the facts of this case, testimony as to the observation of this action coupled with a simple instruction by the court that the officers stopped defendant while conducting an investigation should have sufficed. *(People v Fay,* 85 AD2d 512, 514 [1st Dept 1981] [Carro, J., dissenting]; *People v Brockington, supra.)* Thus, while in some cases, evidence of uncharged crimes is admissible to provide a complete picture of events *(see, People v Montanez,* 41 NY2d 53, 58 [1976]; *People v Gines,* 36 NY2d 932, 933 [1975]; *see also, People v Castro,* 101 AD2d 392, 396 [1st Dept 1984], *affd* 65 NY2d 683 [1985]), it was simply unnecessary here and constituted an abuse of discretion. *(People v Le Grand,* 76 AD2d 706, 708-709 [2d Dept 1980].) The error is of particular concern where, as here, the court initially and correctly acknowledged the propriety of, and indeed *proposed* issuance of an instruction that the arresting officers were investigating reports of an unrelated crime and were following legitimate police procedures when they proceeded onto 51st Street and drew their guns.

Because of the court's erroneous ruling, the testimony regarding the Clinton Park incident became an integral part of the evidence presented against defendant. This testimony, repeated in sum and substance by both officers and also referred to on the prosecutor's summation, was of such quality and repetitive nature that even were it to have been relevant, it exceeded any permissible bounds of background material. *(People v Stanard,* 32 NY2d 143, 147 [1973].) Almost one quarter of Switzer's testimony was devoted to the Clinton Park incident, while Dicanio gave a blow-by-blow account of his observations at the park, the civilian witnesses and their statements, including the descriptions given, and his investigation of their reports.

To my mind, this amount of evidence, regarding an identical crime committed 20 minutes earlier, could only have resulted in undue prejudice to the defendant with the outcome that his conviction was, in no small measure, based upon the testimony regarding the Clinton Park incident. *(People v Schwartzman,* 24 NY2d 241, 247 [1969]; *People v Castro,* 101 AD2d, *supra,* at 401 [Fein, J., dissenting].) Indeed, I frankly believe that the Clinton Park evidence was presented for the singular purpose of demonstrating not only that defendant was of a criminal disposition, but that, in fact, he was disposed to

commit this *very* crime. *(Cf., People v Fay,* 85 AD2d, *supra,* at 513.)* Furthermore, the resulting taint was incurable; even repeated limiting instructions were insufficient to afford defendant the fair trial that is his right, and the court's obligation to ensure. *(People v Stanard,* 32 NY2d, *supra,* at 147; *People v Fay,* 85 AD2d, *supra,* at 515.)

Accordingly, the judgment of the Supreme Court, New York County (Allen Alpert, J.), rendered April 27, 1989, convicting defendant, after a jury trial, of criminal possession of a weapon in the third degree, and sentencing him to an indeterminate sentence of 3½ to 7 years, should be reversed and the matter remanded for a new trial.

---

* While the People attempt to rely on the majority decision in *People v Fay* (85 AD2d 512), that case is distinguishable from the one herein in that in *Fay,* the defendant's contention was that the police planted a gun on him in order to fabricate evidence to bolster an otherwise weak robbery case. Thus, in the instant case there can be no meritorious argument analogous to that which was successfully raised in *Fay (supra,* at 512), that the two incidents were "inextricably intertwined."