THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DOMINGO CORREAL, Also Known as CORREAL DOMINGO, Appellant.

First Department, August 9, 1990

## APPEARANCES OF COUNSEL

*James M. McGuire* of counsel *(Norman Barclay* and *Eleanor*

*J. Ostrow* on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Winston McIntosh* of counsel *(Philip L. Weinstein,* attorney), for appellant.

## OPINION OF THE COURT

CARRO, J.

Justice, as well as law, requires a criminal conviction to be based upon evidence establishing beyond a reasonable doubt that the accused committed the specific crime or crimes of which he has been formally charged and tried, and not upon evidence showing that he has a propensity to commit the type of criminal conduct at issue. In the case at bar, defendant stood accused of crimes arising out of an incident, involving the alleged attempted murder of two police officers. However, the record makes clear that he was in fact tried for criminal acts which allegedly took place both on the date in question and nine days earlier, that being the alleged armed robbery of a gypsy cab. It is obvious to us that the evidence concerning the prior, uncharged incident was largely irrelevant other than for the purpose of showing that defendant was predisposed to commit armed violent felonies. Thus, this evidence should have been excluded.

### *The Charged Crimes—Attempted Murder and Gun Possession*

On September 20, 1985, Detective Gregory Modica and Police Officer Patrick Rogers, both in plain clothes and assigned to the Manhattan Robbery Squad, were driving their unmarked car on the upper West Side of Manhattan. At approximately 7:00 P.M., while they were stopped for a traffic light at the corner of Broadway and 157th Street, they observed a man driving a livery or gypsy cab, in which defendant and one Fernando Ferrer[1] were apparently passengers in the back seat. Modica called out to defendant, asking him "Don't I know you?" Defendant responded in the negative. Modica then inquired of defendant what his name was, to which defendant answered "Mingo".

It should be noted that the gypsy cab in which the men were riding was unquestionably a stolen vehicle. However, it is equally beyond dispute that the officers did not know or

---

1. Ferrer's case was severed from defendant's.

have reason to know this at the time. Regardless, Modica and Rogers, identifying themselves as police officers, directed the driver to pull over to the side of the street.

When the light turned green, the cab first proceeded slowly, but then sped off. Modica and Rogers did likewise, pursuing the vehicle. Modica activated the siren, and, in addition, signalled to and yelled at the driver to pull over. Not only did the driver fail to comply, but he turned off Broadway onto 155th Street, which was a dead-end street. The occupants exited the car, fleeing on foot.

Modica and Rogers, with their guns drawn, exited their car and gave chase. The driver scaled a wall and, for all intents and purposes, vanished into the ether. Defendant and Ferrer, choosing a different course, ran to a nearby footbridge, which led to a park. Modica contended that both men had guns in their hands; Rogers claimed that he saw but one gun, a dark revolver, in defendant's hand.

The officers asserted that as defendant reached the footbridge, he turned around, and fired a single shot at them, holding the gun in his right hand.[2] While the officers maintained, during their trial testimony, that they were in front of their vehicle when the shot was fired, their separately prepared firearm discharge reports as well as a diagram prepared by their duty captain, indicated that they had sought protective cover behind their car. Neither officer was struck. At that time, Rogers fired a shot in return, which did not hit either of the fugitives.

The officers then chased the men from the footbridge toward a ramp of the Henry Hudson Parkway. Reaching the bottom of the bridge, and proceeding along the exit ramp, defendant allegedly turned around and once again fired at the officers; neither officer was struck by a bullet. This time Modica returned fire, but did not strike his target. The absconders then proceeded north, away from the footbridge, and disappeared.

Shortly thereafter, Modica who had separated from Rogers,

---

2. Gabriel Cotorreal, defendant's 13-year-old brother, testified that defendant was left-handed and used his left hand to write, eat, and throw. Felix Klein, a graphologist, also testified on behalf of defendant, stating that based upon tests administered to defendant, he determined that defendant would use his left hand to fire a gun. This testimony went largely unrefuted, although Police Officer Joseph Alemeda, an instructor in marksmanship, testified that some people shoot with their right hand despite being left-handed in other respects.

discovered a broken, imitation silver gun which had black tape wrapped around the grip. He recalled that the gun was recovered at the bottom of the footbridge, in a gutter. Meanwhile, Rogers found and apprehended Ferrer in a wooded area near 162nd Street. No other ballistics evidence was recovered at the scene; neither were there any bullets recovered. As to the gun which was recovered, both officers contended that it was *not* the gun they allegedly saw in defendant's hand.

Based upon information supplied by Ferrer, Modica obtained a photo of defendant and learned that he resided on Walton Avenue in The Bronx. A cadre of officers were instructed by Lieutenant Thomas Houston to go to the building in search of defendant. One detective, Harold Kukk, testified that as he entered the building, he saw a man with a dark revolver in his waistband. Kukk was unable to apprehend the man, described as Hispanic, who ran away. On two other occasions, the police stopped defendant in the building, apparently without realizing he was the man they sought.

However, a few minutes later, Police Officer Joseph Cialone and Detective James Serra, who had earlier told defendant that he was not the man they were looking for, apprehended defendant as he exited the building. Serra and Houston brought defendant back into the building, where, in his apartment, they recovered a jacket which he had allegedly been wearing during the chase and gunfire. They did not, however, recover a gun.

Gabriel Cotorreal testified that he shared a room with his brother at the Walton Ave, Bronx apartment, where their mother, sister, and nephews also resided. Cotorreal stated that for some time prior to September 20, 1985 defendant kept an imitation gun—the gun found by Modica—hidden in their bedroom closet. He also testified that when defendant was arrested, one officer put his neck in a "yokehold" and a second officer hit defendant in the stomach.

Twelve fingerprints were lifted from the gypsy cab by Detective Gerald Donahue. Detective Aniello Falanga, of the Latent Fingerprint Unit, testified that while none of the nine useable prints matched Ferrer's prints, five belonged to defendant. Of these, one was from the outside of the right rear window, and only one was from the inside of the cab, specifically, from the inside of the right rear window.

Defendant, who was duly advised of his *Miranda* rights, made a series of statements. Cialone testified that defendant

told him that he and Ferrer went to Manhattan "to rip off a drug spot." Defendant variously denied having had a gun that evening, admitted that at the time the police looked for him at the Walton Avenue (Bronx) apartment building he had in his possession a .22 caliber gun which was black with a wood handle, and was loaded with two shells; however, he further told Kukk and Serra that he had thrown it out of one of the stairway windows.[3] In the course of a videotaped statement, defendant stated Ferrer and one "Willie" offered him a ride in the cab, and, although he was told, and thus knew, that it was stolen, he had never been in the car before that ride. Defendant also stated that following the officers' attempt to stop the cab, they fired two shots at him and Ferrer; however, he adamantly maintained that not only did he not return fire, but that he did not, at that time possess a loaded, operable gun. During the videotaped statement, defendant also denied having possessed a gun at the Bronx apartment, contending that he admitted having a gun there because the officers had beaten him. In addition, in his videotaped statement, defendant stated that he had only considered, rather than actually planned on, ripping off a "drug spot".

### The Molineux Ruling

Defendant made a pretrial motion to preclude the People from introducing evidence that nine days prior to the incident in question, he and Ferrer had allegedly robbed one George Rosado, whom the prosecutor described at the hearing as a "lowlife", of his gypsy cab at gunpoint. The prosecutor, opposing the application, argued that because the same cab was involved in both incidents, the evidence of the uncharged robbery should be permitted as probative of defendant's motive. The prosecutor theorized that defendant's motive was to shoot at the police—in Manhattan—to avoid apprehension for the robbery, which occurred nine days earlier in The Bronx.

It is worth more than a passing comment that the final disposition of the September 11, 1985 incident was a plea to unauthorized use of a vehicle in the third degree, a class A misdemeanor, for which defendant received a sentence of one year. This plea was offered after, and with full knowledge of the charges pending in the case at bar. Moreover, we note

---

**3.** Kukk and Lieutenant Houston returned to the Bronx building to look for the gun, enlisting defendant's assistance, as well as that of the other officers; this search was fruitless.

that on June 16, 1986, the Bronx District Attorney's office *dismissed* charges of robbery in the first and second degrees, criminal possession of stolen property in the first degree, and criminal possession of a firearm in the first degree, leaving outstanding only a charge of unauthorized use of a vehicle in the second degree. It was from this that defendant entered on July 10, 1986, a misdemeanor plea in satisfaction of his remaining charge.

It is also noteworthy that counsel offered to concede at trial that defendant knew the cab was stolen. However, the court declined to accept this compromise, ruling that this concession would "not provide a sufficient motive or supply a credible explanation for defendant's shooting at the officers."

In this regard, the court ruled that in addition to the general admissibility of the evidence, Rosado's identification of defendant as one of the men who robbed him, which was made as the result of a duly conducted lineup procedure, was "sufficiently strong and direct as to preclude that earlier event, offered as the motive for the shooting in this case, from overshadowing the facts and issues here or from becoming a 'trial within a trial' by generating collateral issues."

### The Uncharged Crimes—Robbery and Gun Possession

George Rosado was the star witness who testified as to the uncharged robbery.[4] As the People note in their brief, Rosado "had a considerable criminal record", including larceny, forgery, possession of stolen property and drug offenses. In addition, Rosado acknowledged committing additional crimes for which he was never arrested or charged, including selling drugs, as well as other larcenies and forgeries. At the time the case at bar was tried, he had three criminal matters pending.

Rosado testified that between 11:00 and 11:30 P.M. on September 11, 1985, some nine days prior to the subject incident, he was driving his gypsy livery cab in The Bronx. Rosado, who acknowledged that he had been drinking beer while he was driving, dropped off a couple with a baby at 170 Street and Grand Concourse, when two Hispanic men hailed his cab. The passengers told Rosado that their destination was Kingsbridge Terrace, where Rosado proceeded to drive them. However, rather than pay the fare at the end of the ride, Rosado

---

4. While we note that both the People and defendant refer to the "Rosado robbery," we consider this to be a misnomer, in view of the misdemeanor plea to unauthorized use.

claimed that one of the men, allegedly defendant, put a gun to the back of his head and ordered him to lie down on the front seat. While Rosado complied, the other man, who Rosado contended was Ferrer, allegedly went to the front seat and removed $75 from the glove compartment, as well as taking papers—including Rosado's license and the car registration—from Rosado's pocket.

Pages and pages of Rosado's testimony are dedicated to discussing the gun and defendant's alleged use of it. He stated that he initially felt only "the coldness of the gun". However, he described the gun in exquisite detail, despite the fact that he was face front on the seat while the gun was allegedly at the back of his neck; he stated that he was able to turn slightly and examine the gun. He talked at length about the small dark revolver, educating the jury in the process, by stating that he knew the gun was a revolver "because an automatic gun doesn't have a chamber, a cylinder and you have to pull it back instead of just pushing back the chamber."

Shortly thereafter, the gunman told Rosado to get out of the car. Rosado recalled that he initially balked because the car "was the way I made my living" but was told it would be in his best interests to leave the car and that "that's when he cocked the gun." Rosado, when asked how he knew the gun was cocked, since he was facing forward, dramatically proclaimed "there's no sound like it in the world. Tell [sic] when a gun is cocked at you." Rosado asserted that he promptly opened the door and left the car. While defendant allegedly pointed the gun at Rosado, Ferrer drove away, telling Rosado they "would leave the car on some street." Rosado's testimony was some 100 pages in length.

Police Officer Thomas Duno testified that he responded to Rosado's 911 call. He recalled that Rosado seemed coherent as they drove around the area in their unsuccessful search for the cab.

### Summations and Verdict

Several pages of the prosecutor's summation made reference to the Rosado incident. Among other statements, the prosecutor, arguing that defendant shot at Modica and Rogers in order to avoid apprehension for stealing, at gunpoint, the cab they were in, noted that the Rosado robbery: "also tells you a little bit about whether the defendant would use a gun in

those circumstances. On September 20th, why would he shoot at the police? *On September 11th why would he cock the gun behind George Rosado's head? * * * Consider how he used the gun on September 11th, he cocked it. He was prepared to use it on September 11th, prepared to use it on September 20th"* (emphasis added).

The prosecutor later again focused on the Rosado incident, telling the jury: *"He had, I submit, committed a gun-point robbery of George Rosado. * * * He was a man who was going out to rob a reefer spot at gunpoint. He stands responsible for his a conduct like everybody."*

Defense counsel moved for a mistrial after the prosecutor's summation, specifically including in his argument that the prosecutor had used the Rosado incident to demonstrate that defendant had a propensity to use guns. The court denied the motion indicating that it would instruct the jury as to the appropriate use of the Rosado testimony, as it had done after Rosado's testimony.

Defendant was acquitted of all charges save two—criminal possession of a weapon in the second and third degrees. He thus stood convicted solely of gun possession.

### *The Motive Exception to the Molineux Doctrine*

The sole issue on this appeal is whether the evidence regarding the Rosado incident should have been excluded, under the *Molineux* doctrine. *(People v Molineux,* 168 NY 264 [1901].)

It is well settled that evidence of crimes not charged in the indictment must be excluded where it is offered solely to show the defendant's criminal propensity. *(People v Hudy,* 73 NY2d 40, 54-55 [1988]; *People v Alvino,* 71 NY2d 233, 241 [1987]; *People v Sanchez,* 154 AD2d 15, 23 [1st Dept 1990]; *People v Ortiz,* 142 AD2d 248, 250-251 [1st Dept 1988].) The rationale underlying this rule is that there is an inherent danger, that due to human nature, the finders of fact will be more likely " 'to believe in the guilt of an accused person when it is known or suspected that he has previously committed a similar crime' " *(People v Sanchez, supra,* 154 AD2d, at 23), and that this tendency must be counteracted. *(People v Fitzgerald,* 156 NY 253, 260 [1898].)

However, evidence of uncharged crimes may be admitted if there is a logical link to a specific material issue relating to the crime charged; nevertheless the probative value must

outweigh the prejudicial impact of the evidence. *(People v Hudy, supra,* 73 NY2d, at 54; *People v Ventimiglia,* 52 NY2d 350, 359 [1981]; *People v Ortiz, supra,* 142 AD2d, at 251 [1st Dept 1988].) The *Molineux* doctrine recognizes that evidence of uncharged crimes may be relevant to show, *inter alia,* "(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial." *(People v Molineux,* 168 NY 264, 293, *supra.)*

When the admission of the evidence is not automatically barred under the *Molineux* doctrine, a trial court is required to strike a balance between the probative value and prejudicial impact before making a ruling allowing evidence of uncharged crimes to be heard by the jury. *(People v Satiro,* 72 NY2d 821, 822 [1988]; *People v Ventimiglia, supra,* 52 NY2d, at 356, 360-361; *People v Sanchez, supra,* 154 AD2d, at 23.)

The exception invoked by the People here is that of motive. It is, of course, proper to introduce evidence which demonstrates motive to commit a crime, or motive to avoid punishment for prior criminal conduct. *(People v Mees,* 47 NY2d 997, 998 [1979] [evidence that a charge for assaulting the victim was pending against defendant at time of homicide properly admitted]; *accord, People v Morales,* 75 AD2d 745, 746 [1st Dept 1980] [evidence of prior alleged rape of complainant properly admitted to show motive of defendant for committing charged crimes, i.e., burglary and assault, was in fact, to silence complainant from testifying in pending rape case]; *cf., People v Ely,* 68 NY2d 520, 529-531 [1986].)

The purported motive sought to be established in the case at bar was the motive to avoid apprehension for the Rosado incident, which occurred nine days before the alleged attempted murder of the officers. The testimony given, however, which was subsequently referred to during the prosecutor's summation, was of such a quantity and repetitive nature that it exceeded all permissible bounds. *(See, People v Ely, supra,* 68 NY2d, at 531-532; *see also, People v Stanard,* 32 NY2d 143, 147 [1973]; *People v Brown,* 160 AD2d 440, 443 [Carro, J., dissenting].)* As the Court of Appeals has stated, "[p]rejudice involves both the nature of the crime, for the more heinous the uncharged crime, the more likely that jurors will be swayed by it, and the difficulty faced by the defendant in seeking to rebut the inference which the un-

charged crime evidence brings into play" *(People v Robinson,* 68 NY2d 541, 549 [1986]). Applying this standard to the facts herein, we hold that the vast array of evidence, relating to a gun crime committed nine days earlier, in another county, as well as the repetitive nature of that evidence and the inappropriate use to which it was put during the prosecutor's summation, could only have resulted in undue prejudice to the defendant with the result that his conviction was, in no small measure, based upon the Rosado incident.

Rosado's dramatic rendition of the uncharged crime, including "the coldness" of the gun at his neck, the unforgettable sound of a cocked gun, the near expert testimony distinguishing automatic guns from revolvers, was strictly collateral to the simple issue to be decided herein—whether, as testified to by the officers, defendant pointed a gun at them and shot it in an attempt to kill them. *(Compare, People v Fitzgerald, supra,* 156 NY, at 258 [evidence of motive is admissible "for the important aid it may render in completing the proof of the commission of the act when it might otherwise remain in doubt"].) Hence, the evidence of the Rosado incident should not have been admitted.

In reversing, we observe that while the evidence adduced was legally sufficient to sustain a verdict finding defendant guilty of possession of a weapon, it was far from overwhelming. There can be no argument that the extensive evidence of this uncharged armed violent felony was harmless, in view of the fact that the only crimes of which defendant was convicted were the gun possession charges. *(People v Lewis,* 69 NY2d 321, 323, 328 [1987] ["cumulation of defendant's criminal acts seriously prejudiced defendant in the eyes of the jury"].)

Furthermore, the prosecutor's comments on summation served as an overt reminder to the jury to consider the testimony of the Rosado incident as exhibiting defendant's propensity to commit gun crimes. *(People v Sanchez, supra,* 154 AD2d, at 25; *see also, People v Stewart,* 153 AD2d 706 [2d Dept 1989]; *accord, People v Alling,* 69 NY2d 637, 638 [1986], *revg on dissent below* 118 AD2d 960 [3d Dept 1986] [improper for prosecutor to argue that defendant's expressed willingness to use a gun to defend himself showed predilection for violence while armed]; *see also, People v Stanard, supra,* 32 NY2d, at 147.)

Accordingly, the judgment of Supreme Court, New York

County (Rena Uviller, J.), rendered June 2, 1987, which, convicted defendant, after a jury trial, of criminal possession of a weapon in the second and third degrees, and sentenced him to concurrent indeterminate terms of imprisonment of 5 to 15 and 2½ to 7 years, should be reversed, on the law, and the matter remanded for a new trial.

KUPFERMAN, J. P. (dissenting). As indicated in the majority opinion, the only issue is whether the evidence in the Rosado incident should have been excluded under the *Molineux* doctrine. *(People v Molineux,* 168 NY 264.)

Initially, it should be emphasized that the defendant was acquitted of the attempted murder and assault charges, so that it appears that the jury was not overcome by the evidence of the earlier crime.

The defendant does not contest his guilt of criminal possession of a weapon. His contention at the trial was that it was illogical for him to shoot at armed police, and in response to that contention, it was necessary to show that he was seeking to avoid capture for the previous crime. The evidence of guilt is overwhelming and to remand for a new trial on the counts of criminal possession of a weapon in the second and third degrees, based on a *Molineux* issue, would seem to be inappropriate.

SULLIVAN, ELLERIN and SMITH, JJ., concur with CARRO, J.; KUPFERMAN, J. P., dissents in an opinion.

Judgment, Supreme Court, New York County, rendered on or about June 2, 1987, reversed, on the law, and the matter remanded for a new trial.